IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| CHRISTOPHER COSTA, M.D., | ) | 4:05CV3248 |
| | ) | |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM** |
| vs. | ) | **AND ORDER** |
| | ) | |
| MICHAEL O. LEAVITT, Secretary, | ) | |
| U.S. Department of Health and Human | ) | |
| Services, and his Successors; UNITED | ) | |
| STATES DEPARTMENT OF HEALTH | ) | |
| AND HUMAN SERVICES; and the | ) | |
| NATIONAL PRACTITIONER DATA | ) | |
| BANK, an Entity of and Run by the | ) | |
| U.S. Department of Health and Human | ) | |
| Services, | ) | |
| | ) | |
| Defendants. | ) | |

        This is an action under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 et seq., for judicial review of a final decision issued by the Secretary of the United States Department of Health and Human Services ("HHS") on August 24, 2005, denying the plaintiff's request that the Secretary void an adverse action report concerning him that was filed with the National Practitioner Data Bank on April 6, 2005, by Gothenburg Memorial Hospital ("GMH"), located in Gothenburg, Nebraska. The matter is submitted to the court for determination on cross-motions for summary judgment (filings 26, 28). Based upon the undisputed facts as established by the pleadings (filings 1, 11) and the administrative record (sealed filing 21, hereinafter "AR"), and after careful consideration of the arguments presented in the parties' briefs (filings 27, 29, 34, 35, 38, 39), I conclude that the plaintiff's motion should be granted, and that the defendants' motion should be denied, because the Secretary's decision is arbitrary and capricious. See 5 U.S.C. § 706(2)(A).

# I.  BACKGROUND

The Health Care Quality Improvement Act of 1986 ("HCQIA"), Title IV, Pub. L. 99-660, as amended, requires each health care entity which accepts the surrender of clinical privileges of a physician while the physician is under an investigation by the entity relating to possible incompetence or improper professional conduct, or in return for not conducting such an investigation or proceeding, to report the surrender to the state board of medical examiners.  See 42 U.S.C. §§ 11133(a)(1)(B); 45 C.F.R. § 60.9(a)(1)(ii).  The state board must then forward this information to the Secretary of Health and Human Services by submitting a report to the National Practitioner Data Bank ("NPDB").  See 42 U.S.C. §§ 11133(b) and 11134; 45 C.F.R. §§ 60.4, 60.5(c), and 60.9(b).   According to current HHS guidelines, however, a reportable surrender of a physician's clinical privileges is to be reported directly to the NPDB by the health care entity, and a copy of the report is to be sent to the appropriate state licensing board.  See National Practitioner Data Bank Guidebook, at E-17 (available on the Internet at http://www.npdb-hipdb.hrsa.gov/npdbguidebook.html).

Information reported to the NPDB is accessible to state licensing boards and to any health care entity where the physician is employed or affiliated or is seeking employment or affiliation.  See 42 U.S.C. §§ 11137(a); 45 C.F.R. §§ 60.11.  In fact, hospitals are required to request information from the NPDB whenever a physician applies for a position on its medical staff or for clinical privileges, and also every two years to check the status of each physician who currently is on its medical staff or has clinical privileges.  See 42 U.S.C. §§ 11135(a); 45 C.F.R. §§ 60.10.  A person or entity reporting information as required by the HCQIA is immune from civil liability unless the information was known to be false.  See 42 U.S.C. §§ 11137(c).

A physician who is the subject of an inaccurate report has 60 days to notify the Secretary and the reporting entity, whereupon the report will be placed in "disputed status."  See 45 C.F.R. §§ 60.14(b).  If the reporting entity does not revise the

reported information, the Secretary, upon request, will resolve the dispute by reviewing written submissions from both parties.  See 45 C.F.R. §§ 60.14(c).  "The Secretary reviews disputed reports only for accuracy of factual information and to ensure that the information was required to be reported."  NPDB Guidebook, at F-3.

The plaintiff in this case, Christopher Costa, M.D., is a family practitioner who held hospital staff privileges at GMH from March 1996 until July 2004, when he resigned from the hospital's medical staff.  The resignation followed a vote by the medical staff to recommend to the hospital board that Dr. Costa's application for renewal of staff privileges be denied.  The hospital's CEO, John H. Johnson, falsely reported to the NPDB on July 21, 2004, that Dr. Costa had surrendered his staff privileges while he was under investigation by the Nebraska Department of Health and Human Services.[1]  Dr. Costa promptly disputed the report, but it was not changed until April 6, 2005, when Mr. Johnson filed a "correction" report[2] stating:

> Dr. Costa's competence and professionalism were under review at the Gothenburg Memorial Hospital at the time he withdrew his medical staff application for re-appointment and surrendered his privileges.  The medical staff had concerns regarding recent obstetrical cases in which Dr. Costa was the primary physician, as well as concerns regarding his professionalism to nursing and administrative staff.   Dr. Costa surrendered his privileges one and one half hours after the medical staff unanimously voted to reject his application for reappointment and prior to that recommendation being forwarded to the board of directors for further action.

(AR 88 (original all in uppercase type).)  Dr. Costa also sought to have the correction report voided, but the Secretary found "no basis on which to conclude that the

---

[1] Even if there had been such an investigation, it could only have been reported by the state agency.

[2] "A Correction is a change intended to supersede the contents of the current version of a report."  NPDB Guidebook, at E-5.

[correction] report should not have been filed or that it is not accurate." (AR 193.) Specifically, the Secretary decided there was a reportable event because "[t]he record reflects that [Dr. Costa] voluntarily surrendered [his] clinical privilege(s), while under investigation." (AR 194.) Dr. Costa challenges this decision.

### A.  Standard of Review

Under the APA, an agency administrative decision may be set aside only if it is "arbitrary, capricious, and an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "in excess of statutory . . . authority," id. § 706(2)(C), or "without observance of procedure required by law," id. § 706(2)(D).  Friends of Boundary Waters Wilderness v. Bosworth , 437 F.3d 815, 821 (8th Cir. 2006).

> "When reviewing an agency's construction of a statute, the court first considers whether the intent of Congress is clear; if so, the court's inquiry is over, 'for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'"  [Friends of the Boundary Waters Wilderness v. Dombeck, 164 F.3d 1115, 1121 (8th Cir. 1999)]  (quoting Chevron U.S.A. Inc. v. Natural Res. Def. Council, 467 U.S. 837, 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)); see also Cuadra v. Gonzales, 417 F.3d 947, 950 (8th Cir.2005).

> Where Congress has explicitly or implicitly left a gap in a statute to be filled by a particular agency, the agency's interpretations of the statute having the force of law are entitled to substantial deference under Chevron.  United States v. Mead Corp., 533 U.S. 218, 230, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001).  Chevron deference requires courts to give "considerable weight ⋯ to an executive department's construction of a statutory scheme it is entrusted to administer." Chevron, 467 U.S. at 844, 104 S.Ct. 2778.  This considerable weight has been interpreted by the Eighth Circuit to mean controlling weight unless "arbitrary, capricious, or manifestly contrary to the statute."  In re Old Fashioned Enters., Inc., 236 F.3d 422, 425 (8th Cir.2001).

4

Even where an agency is accorded deference, the "agency must provide a satisfactory explanation for its actions based on relevant data." Niobrara River Ranch, L.L.C. v. Huber, 373 F.3d 881, 884 (8th Cir. 2004). This requires an analysis of whether the decision was "based upon consideration of the relevant factors and whether there has been a clear error of judgment." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). If an agency's decision to which deference is afforded may be supported on any rational basis, we must uphold it. Voyageurs Nat'l Park Ass'n, 381 F.3d at 763; Sw. Bell Tel. Co. v. Fed. Comm. Comm'n, 153 F.3d 523, 554 (8th Cir.1998) ("If an agency ⋯ does not attempt either to close itself off from informed opinion or to extend its reach beyond the scope of permissible authority, then it is our duty to accept that judgment if it is rational and not unreasonable."). Therefore, even if the agency's underlying data are flawed, substantial deference requires the ruling be reversed only if "'there is a significant chance that but for the errors the agency might have reached a different result.'" Cent. S.D. Co-op. Grazing Dist. v. Sec'y of the United States Dep't of Ag., 266 F.3d 889, 899 (8th Cir.2001) (quoting Dombeck, 164 F.3d at 1129).

Because an agency's choice of methodology is typically borne out of the agency's expertise, we defer to an agency's choice of methodology so long as it is not arbitrary or without foundation. See Dombeck, 164 F.3d at 1130 (citing Minn. Pub. Interest Res. Group v. Butz, 541 F.2d 1292, 1302 (8th Cir. 1976)). A decision is arbitrary or capricious if the agency relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs contrary to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

Id., at 821-22.

Substantial deference is accorded to an agency's interpretation of its own regulation, unless the regulation violates the Constitution or a federal statute, or

5

unless the interpretation is plainly erroneous or inconsistent with the regulation. South Dakota v. U.S. Dept. of Interior, 423 F.3d 790, 799 (8th Cir. 2005).

> As the reviewing court, we engage in a substantial inquiry, based on an examination of the administrative record, in order to answer three questions: (1) whether the Secretary acted within the scope of his authority, Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); (2) whether the decision was "based on a consideration of the relevant factors," id. at 416, 91 S.Ct. 814; and (3) whether the Secretary "follow[ed] the necessary procedural requirements." Id. at 417, 91 S.Ct. 814. . . .

> We are to make a searching inquiry into the facts, examining the full administrative record, 5 U.S.C. § 706, but we do not substitute our judgment for that of the agency, South Dakota v. Ubbelohde, 330 F.3d 1014, 1031 (8th Cir.2003), even if the evidence would have also supported the opposite conclusion. Harrod v. Glickman, 206 F.3d 783, 789 (8th Cir. 2000). We ask whether the agency "'articulate[d] a rational connection between the facts found and the choice made.'" Ubbelohde, 330 F.3d at 1031 (quoting Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 288, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974)); see also Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 48, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (stating that "an agency must cogently explain why it has exercised its discretion in a given manner"). We will not try to identify failures in clarity or detail, State Farm, 463 U.S. at 43, 103 S.Ct. 2856, and will reverse "only when there is no rational basis for the policy choice." Ubbelohde, 330 F.3d at 1032. In other words, the agency need not exhaustively analyze every factor, but must base its determination "upon factors listed in the appropriate regulations" and must use a "reasonable interpretation of the regulation and the statute" in reaching its conclusion. Harrod, 206 F.3d at 788. The burden is on the plaintiff to prove that the agency's action was arbitrary and capricious. [United States v. Massey, 380 F.3d 437, 440 (8th Cir.2004).]

Id. at 799-800.

6

### B.  Statement of Facts

As provided in Article IV, Section 3, of the By-Laws of the Medical Staff of Gothenburg Memorial Hospital ("By-Laws"), members of the GMH medical staff must renew their appointments and clinical privileges at least every two years:

> A.    Initial appointments and reappointments to the Medical Staff will be made by the Governing Board.  The Governing Board will act on appointments and reappointments only after there has been a recommendation from the active Medical Staff in accordance with the provisions of these By-Laws and associated Rules and Regulations of the Medical Staff.[3]
>
> B.    Initial appointments and reappointments to the Medical Staff will be for no more than two (2) year intervals.
>
> C.    Appointment to the Medical Staff shall confer on the appointee only such clinical privileges as have been granted by the Board.

(AR 131.)  The renewal procedure is set forth in Article IV, Section 7, of the By-Laws:

> A.    All members of the Medical Staff . . . will be required to complete a renewal application for Medical Staff privileges at least sixty (60) days prior to the expiration of their current appointment term. . . .
>
> B.    Each recommendation concerning renewing application of a Medical Staff member and the clinical privileges to be granted upon renewal shall be based upon such member's professional competence and clinical judgment in the treatment of patients as demonstrated by reviews and evaluations conducted by committees in quality management activities; peer recommendations; maintenance of timely, accurate, and complete

---

[3] These rules and regulations are not contained in the administrative record.

medical records; privileges requested with any basis for change; service on staff and Hospital committees when requested; ethics and conduct; attendance at Medical Staff meetings and participation in staff affairs; compliance with Medical Staff By-Laws and the Medical Staff Rules and Regulations; verification of his/her license to practice; participation in continuing education programs during the last year; cooperation with hospital personnel; use of Hospital's facilities for his/her patients; relations with other practitioners; and general attitudes towards patients, Hospital, and the public.

C.     Thereafter, the procedure provided in Article IV, Section 6, relating to recommendations on applications for initial appointment shall be followed.

(AR 134-35.)  The above-referenced Article IV, Section 6, provides:

A.     The completed application form shall be presented to the CEO. After collecting any other materials deemed pertinent, the CEO shall transmit the application and all supporting material to the active Medical Staff.

B.     At the first regular meeting after the CEO transmits the application, the active Medical Staff will forward the application to the Board with or without a recommendation for approval.

C.     The active Medical Staff shall examine the evidence of the character, professional competence, qualifications and ethical standing of the applicant and shall determine, through information contained in reference given by the applicant and from other sources available to the active Medical Staff, whether the applicant has established and meets all fo the necessary qualifications for the category of staff membership and the clinical privileges requested.

D.     The active Medical Staff will recommend that the application be accepted, deferred, or rejected.

8

E.     When the recommendation of the active Medical Staff is to defer the application for further consideration, it must be followed up within 60 days with a subsequent recommendation for appointment with specific clinical privileges, or for rejection for staff membership.

F.     If the Governing Board's decision is adverse to the applicant, the CEO shall promptly notify the applicant by registered mail, return receipt requested.  He/she shall be entitled to a hearing as set forth in Article XV of these By-Laws.

G.     If a hearing is held, at its next regular meeting after the hearing, the Governing Board shall make a decision either to appoint the applicant to the Medical Staff or to reject staff membership.  All decisions to appoint shall include a delineation of the clinical privileges that the physician, podiatrist or dentist may exercise. If no hearing is requested as provided for in Article XV, the decision of the Board shall be final.

H.     When the Governing Board's decision is final, it shall send notice of such decision to the applicant by certified mail, return receipt requested.

(AR 133-34.)  A staff member whose application for reappointment and renewal of privileges receives a recommendation of rejection is entitled to written notice under Article XV, Sections 1 and 2, which provide:

Section 1. Right to Hearing and Appellate Review. When any physician, dentist or podiatrist receives notice of a recommendation of the active Medical Staff that, if ratified by a decision of the Governing Board, will adversely affect the appointment to, or status as, a member of the Medical Staff or the exercise of clinical privileges, the physician shall be entitled to a hearing before the Governing Board.

Section 2. Request for Hearing.  If the active Medical Staff recommends an adverse action, it shall give the applicant/appointee written notification that the recommendation is adverse and the specific

reasons for the adverse recommendations. [sic]  The notice must advise the applicant/appointee that he/she has a right to a hearing, and that such right must be exercised by notification within thirty (30) days.  The applicant/appointee shall have thirty (30) days from the date he/she received such notification to notify the CEO of his/her desire for a hearing.  Failure to request a hearing within such time period shall be a waiver of the right to hearing and appellate review.

(AR 148-49.)

Article VI of the By-Laws concerns clinical privileges, and it contains a separate section on "disciplinary action" which provides, in pertinent part:

The following shall apply to all Medical Staff members and persons with clinical privileges at the hospital:

A. <u>Grounds for Disciplinary Action</u>.  Whenever, on the basis of information and belief, the Chief of the Medical Staff, CEO, or the Chairperson of the Board, has cause to question:

(1) the clinical competence of any person with clinical privileges;

(2) the care or treatment of a patient or patients or management of a case by any person with clinical privileges;

(3) the known or suspected violation by any person with clinical privileges of applicable ethical standards or the bylaws, policies, rules or regulations of the Hospital or its Board or Medical Staff, or

(4) behavior or conduct on the part of any person with clinical privileges with is considered lower than the standards of the Hospital or disruptive of the orderly operation of the Hospital or its Medical Staff, including the inability of the individual to work harmoniously with others;

10

A written request for an investigation of the matter shall be addressed to the Executive Committee[4] making specific reference to the activity or conduct which gave rise to the request.

B.    Investigative Procedure.  The Executive Committee shall meet as soon after receiving the request as practicable and if, in the opinion of the Executive Committee:

(i)    the request for investigation contains information sufficient to warrant a recommendation, the Executive Committee, at is [sic] discretion, shall make such a recommendation, with or without a personal interview with the individual whose behavior is in question; or

(2)    the request for investigation does not at that point contain information sufficient to warrant a recommendation, the Executive Committee shall immediately investigate the matter.

i.    The Executive Committee shall have available to it the full resources of the Medical Staff and the Hospital to aid in their work, as well as the authority to use outside consultants as required. . . .

ii.    The individual with respect to whom an investigation has been requested shall have an opportunity to meet with the Executive Committee before it makes its report.  At this meeting (but not, as a matter of right, in advance of it) the individual shall be informed of the general nature of the evidence supporting the investigation requested and shall be invited to discuss, explain, or refute it.  This interview shall not constitute a hearing, and none of

---

[4] The Executive Committee consists of the Chief of the Medical Staff, the Secretary/Treasurer of the Medical Staff, and the hospital's CEO.  See Article IX, Section 1, of the By-Laws.  (AR 146.)

the procedural rules provided in this policy with respect to hearings shall apply. The Executive Committee shall make a summary of such interview.

    iii.    The Executive Committee shall make its recommendations to the Board for determination.

(AR 139-40.)

According to Mr. Johnson, Dr. Costa applied for reappointment on March 11, 2004. (AR 60.) Mr. Johnson also states that "[d]uring the course of this [application] review process, Dr. Costa was the subject of a Quality Assurance meeting on April 9, 2004." (Id.) The only documentation in the administrative record regarding this meeting is a memo that was prepared on April 6, 2004, by the chief of medical staff, Dr. Bartruff, to announce the meeting, and a typed statement that Mr. Johnson used in making his opening remarks. Dr. Bartruff's memo (addressed to Dr. Costa, Dr. Reidell, Dr. Shackleton-Skinner, Dr. Hult, Ms. Jensen, and Mr. Johnson) states that "[i]t has been requested by the Hospital Administrator, and I agree, that a Medical Staff Review[5] be completed on the [name redacted] obstetrical case from 4-1-04[,]" and "suggest[s] that Dr. Costa bring all supporting documentation from his clinic." (AR 72.) Mr. Johnson's opening remarks were, in part, as follows:

> I have requested that the members of the Executive Committee address concerns that I have had regarding 3 deliveries that have taken place over the past few months, with the most recent case or cases being last week. The Executive Committee not having sufficient information to warrant a recommendation has determined the need to immediately investigate these concerns.
>
> Other than the members of the EC, the other parties present this morning were all involved in the [name redacted] case that occurred on 4-1-04.

---

[5] "Medical Staff Review" is not a term used or defined in the By-Laws.

. . .

Dr. Costa, the general nature of the evidence supporting this review request are as follows:

- April 1 delivery where membranes were ruptured before a surgery case had been completed, decelerations in the clinic, and no strip accompanying the patient. There may be additional questions or concerns.
- April 2 delivery where full dictation did not accompany patient, no indication of screening done or offered for spina bifida, did an ultrasound indicate this condition, and what other pieces of information should have been available.
- In December, the delivery where the chart did not accompany the patient, information not being provided having to do with pain medication being given, and the manner in which information was relayed to the hospital.

I now turn this meeting over to Dr. Bartruff, the Chief of Staff. Dr. Costa I would suggest that you might discuss, explain or refute any or all of these concerns.

I would also point out that if any others present wants [sic] to be heard privately, they have the right to do so.

(AR 73-74.) While Mr. Johnson's remarks were couched in terms of an executive committee investigation under Article VI of the By-Laws, the record does not reflect that a formal written request for such an investigation was submitted to the executive committee, that a summary of the April 10, 2004 meeting was prepared, or that any recommendation was made to the hospital board by the executive committee.

Dr. Costa's application for reappointment was presented to the medical staff at its regular monthly meeting on June 25, 2004, but due to the lack of a quorum, the matter was postponed until the following week. The staff meeting was reconvened on July 2, 2004, and the minutes show that the following transpired:

13

Mr. Johnson voiced numerous concerns as defined in the Medical Staff Bylaws Section 4, A, C, D,[6] Section 7 item B and numerous documented statements made by Dr. Costa.

> Dr. Costa failing to supervise his PA[7]
>
> PA refusing to take ER call but wanting to remain on active medical staff.
>
> Dr. Costa requesting a status for PA that did not exist in the medical staff bylaws.
>
> Dr. Costa failing to intervene or attempt to correct situations in which his PA was argumentative and verbally abusive to hospital staff members.
>
> Dr. Costa allowing his PA to engage in activities outside her scope of practice.
>
>> a. Stripping membranes in office setting
>>
>> b. Giving TNKase[8] in ER with no supervising physician in attendance

---

[6] Article IV, Section 4, lists responsibilities for staff membership, including that each member will:

A.    Direct the care of his/her patients and will supervise the work of any Allied Health Professionals and mid-level Practitioners under his/her direction;

. . .

C.    Act in an ethical, professional, and courteous manner;

D.    Treat employees, patients, visitors, and other Medical Staff Members in a dignified and courteous manner;

. . .

(AR 131.)

[7] Dr. Costa's physician's assistant ("PA") was his wife, Lety Costa. She states that she has not practiced at GMH since July 1, 2003, when she gave notice that she was going on inactive status. (AR 123.)

[8] TNKase is a drug used for the treatment of acute myocardial infarction.

14

      c.      Allowing PA to deliver babies, perform third and fourth degree perineal tears and lacerations and pull umbilical cord apart.

Dr. Costa accused the hospital and staff of a shameful decline in the quality of care being provided.[9]

Dr. Costa in a letter to the editor, referred to the Administrator as a "tin horn"[10]

In a sworn statement, indicated that the Board of Directors was inadequate in their fiduciary responsibility.

In a sworn statement, indicated that the Board of Directors had "utterly failed" in their responsibility to oversee the administrator of the facility.

Accused the hospital of overcharging for copies of documents (unfounded).

Accused the hospital Board of having secret, illegal meetings (unfounded).

Alleged violation of the HIPPA [sic] privacy issue and signed (OHCA) Organized Health Care Arrangement.

Medical Staff agreed with and voiced numerous other concerns.

---

[9] Dr. Costa launched a recall petition against hospital board members in early 2004, accusing them of "utterly fail[ing] in their responsibility to oversee the present administrator" by "fail[ing] to investigate the general decline of quality employees employed at the hospital and the shameful decline in the quality of care provided[,]" and "not provid[ing] proper financial supervision." (AR 120-21.)

[10] In a letter to the editor of the Gothenburg Times, dated March 15, 2004, Dr. Costa wrote to complain about "[y]et another tragic firing" at GMH, and stated that the fired employee, a nurse anesthetist, was worth more than "one thousand tinhorn hospital administrators." (AR 122.)

15

> After lengthy discussion, Dr. Bartruff called for a vote.  Drs. Shackleton, Hult, Reidell, and Bartruff voted to reject Dr. Costa's application.

(AR 64-65.)

Immediately following the July 2, 2004 staff meeting, Dr. Costa submitted a letter of resignation, stating:

> I hereby withdrawal [sic] my application for hospital privileges at Gothenburg Memorial Hospital as of Tuesday 6/6/04. [sic]  I will no longer function as a member of the medical staff from that day forward.

(AR 119.)  The resignation was accepted by the governing board of GMH at its regular monthly meeting, on July 15, 2004.  The board minutes state:

> The Board also discussed the withdrawal of application and voluntary surrender of privileges from Dr. Costa.  Brent Block motioned to accept the withdrawal of Dr. Costa's application and voluntary surrender of privileges.   Kathi Viergutz seconded and the motion carried unanimously.

> Mike Bacon requested that the minutes reflect that the Hospital Board has taken no action or had direct communication with Dr. Costa.  The only communication has been the withdrawal of Dr. Costa's application. . . .

> Monty Bowman questioned if anything further will need to be done by the Hospital.  The administration will have to report to the state that Dr. Costa withdrew his application and voluntarily surrendered his privileges.

(AR 15-16.)

Although the board minutes do not mention that a report also would be sent to the NPDB, Mr. Johnson prepared and filed an adverse action report that stated:

16

> Dr. Costa withdrew his medical staff application and voluntarily surrendered his current privileges [effective July 15, 2004]. There have been concerns of alleged unprofessional conduct, HIPPA [sic] violations, and other concerns of quality of care currently under investigation by the Nebraska [Department of] Health and Human Services, Regulation and Licensure, Division of Investigations.

(AR 2.) On August 10, 2004, Dr. Costa submitted a responsive "subject statement" to the NPDB and placed the adverse action report in disputed status. Thereafter, on September 20, 2004, Mr. Johnson wrote to the NPDB and enclosed "a [partial] copy of a letter which [he] provided to the Medical Board of California Licensing Program, at its request, explaining the reasons for filing the adverse action report regarding Christopher Costa, M.D." (AR 38.) In the enclosed letter, Mr. Johnson stated:

> I reported to the National Practitioner Databank on July 15, 2004, that Dr. Costa voluntarily surrendered his clinical privileges while under, or to avoid, investigation relating to professional competence or conduct. The report was based on Dr. Costa's relinquishment of hospital privileges following the medical staff's decision to reject his application for renewal and Dr. Costa's presence during the discussion that ensued. At the time of my report to the Databank, I had already filed the report with the Nebraska Department of Health and Human Services and Dr. Costa had been apprised of the hospital's concerns regarding his professional competence and conduct. I have since been advised that the Department will determine whether to conduct an investigation after review of the additional information which I recently forwarded to them.

> It is my belief, that given the timing and sequence of events preceding Dr. Costa's surrender of privileges that he surrendered his privileges in order to avoid an investigation relating to the issues raised during the July 2, 2004, medical staff meeting.

(AR 39.)

17

On October 5, 2004, Dr. Costa, through his attorney, sought secretarial review of the adverse action report and provided the NPDB with, among other things, copies of two letters from the Nebraska Department of Health and Human Services, dated August 9, 2004, and September 27, 2004, confirming that the Department was not actively investigating Dr. Costa; two certifications from the Nebraska Department of Health and Human Services, dated July 8, 2004, and September 30, 2004, which showed no derogatory information was contained in Dr. Costa's records; and two notarized statements signed by Dr. Bartluff on July 12, 2004, and July 26, 2004, verifying that Dr. Costa's staff privileges at GMH had never been limited, restricted, suspended, or revoked, and stating that the hospital had no derogatory information on file regarding Dr. Costa. (AR 9-14.) Dr. Costa's attorney also demonstrated that she had made written demand on Mr. Johnson and GMH on August 10, 2004, to retract the adverse action report, to no avail.

On November 29, 2004, Mr. Johnson was instructed by the Secretary, through a NPDB dispute resolution manager, within 30 days either to void the adverse action report or to provide written confirmation that GMH was investigating Dr. Costa at the time he withdrew his application. The Secretary's letter states, in part:

> According to the record, GMH reported Dr. Costa's "voluntary surrender of clinical privilege(s) while under, or to avoid, investigation relating to professional competence or conduct (1635)."[11] In GMH's narrative **Description of Act(s) or Omission(s) or Other Reasons for Action Taken** reference is made to "... investigation by the Nebraska Health and Human Services, Regulation and Licensure Division of Investigations." Nowhere in the record does GMH reference its _own_ investigation. If GMH was _not_ conducting or about to conduct an

---

[11] The number "1635" is a NPDB data field code for "voluntary surrender of clinical privilege(s) while under, or to avoid, investigation relating to professional competence or conduct." See "Adverse Action Classification Codes - Individual Subjects" at http://www.npdb-hipdb.hrsa.gov/codes.html.

investigation at the time of Dr. Costa's voluntary surrender, his voluntary surrender would not be reportable because it would not be a voluntary surrender of clinical privileges while under, or to avoid, investigation relating to professional competence or conduct. If that is the case, GMH should void the report from the NPDB. If, however, there was a GMH investigation in process at the time of Dr. Costa's voluntary surrender, or Dr. Costa surrendered his privileges to avoid initiation of an investigation of his professional competence or conduct, please forward us written confirmation of that fact. Written confirmation could include such documents as a copy of the notice to Dr. Costa of the hearing or a copy of minutes of the investigation committee.

(AR 31 (emphasis in original).)  Mr. Johnson responded to the Secretary's letter on December 27, 2004, but did not provide any supporting documentation. He merely provided a recitation of events leading up to Dr. Costa's resignation, and opined that "it is likely that the Board would have recommended a further investigation into Dr. Costa's continued status as an active member of the medical staff" had he not withdrawn his application. (AR 45.) He added: "Dr. Costa's voluntary surrender of privileges alleviated that decision from having to be made." (Id.)

On December 28, 2004, Dr. Costa's attorney also responded to the Secretary's letter, arguing that Mr. Johnson "will have to produce either the letter to the Executive Committee [requesting an investigation under Article VI of the By-Laws] or minutes of the Executive Committee reflecting an ongoing or contemplated investigation. (AR 48.)  Dr. Costa also provided an affidavit in which he stated:

At no time prior to surrendering my privileges was I ever notified of an investigation by the hospital Executive Committee, and at no time prior to surrendering my privileges was I ever offered an opportunity to meet with the Executive Committee concerning an investigation.

(AR 50.)  Mr. Johnson replied to this letter on March 4, 2005, providing the Secretary with copies of Dr Bartluff's April 6, 2004 memo announcing the "quality assurance"

meeting, Mr. Johnson's notes for his opening remarks at that meeting, and minutes
of the July 2, 2004 staff meeting.   He also argued:

> [Dr. Costa's attorney] claims that there are only "two possible
> forms of documentation ... in order to support a conclusion that there
> was an investigation at the time of surrender."  The term "investigation"
> however is broad, and is not limited to that set forth in the medical staff
> bylaws.  The fact that Dr. Costa's competence and professionalism were
> under review at the time he relinquished his privileges qualifies as an
> investigation, particularly given the fact that the active medical staff
> voted to reject his application, and that vote would have been forwarded
> to the Hospital Board for further action, which if adverse, would have
> entitled Dr. Costa to a further hearing.

(AR 61.)

On March 10, 2005, apparently before receiving the March 4th correspondence,
the NPDB dispute resolution manager wrote Mr. Johnson to request either that a
correction report be filed or that the filed report be voided.  Her letter states, in part:

> . . .  We have received your recent [December 27, 2004] response to
> our letter of November 29, 2004, raising the question of whether
> Gothenburg Memorial Hospital (GMH) was conducting its own
> investigation into the matter at the time Dr. Costa resigned his clinical
> privileges. . . .  Your letter confirms that according to the timing and
> sequence of events preceding Dr. Costa's surrender of privileges, it is
> your belief that he surrendered his privileges in order to avoid a further
> investigation relating to the issues raised during the July 2, 2004
> medical staff meeting.  In light of that, we ask that you correct your
> report narrative description . . . to be consistent with your letter
> concerning whether Dr. Costa resigned while under investigation or to
> avoid investigation.   Additionally, please state with specificity the
> "alledged [sic] unprofessional conduct, HIPPA [sic] violations, and
> other concerns of quality of care ..." that were of concern to the hospital.

> . . .  Please note that we are asking you to either submit a **correction** report and *not* a **revision to action** report and *not* another **initial** report and in the alternative, to **void** the report.

(AR 78 (emphasis in original).)

As previously discussed, a correction report was filed on April 6, 2005.  Dr. Costa renewed his request for secretarial review and, on May 21, 2005, submitted a legal brief and additional documentation, including copies of his resignation letter, two recall petitions for hospital board members, his letter to the editor, the affidavit of Lety Costa, and a complete copy of the By-Laws.  The matter was then taken under advisement by the Secretary.

The Secretary's decision was issued about three months later, on August 24, 2005, in the form of a letter to Dr. Costa.  It reads, in pertinent part, as follows:

> After review of the information available and the record presented to this office, including supporting documents provided by you through your legal counsel and by GMH, the Secretary finds as follows:
>
>> There is no basis on which to conclude that the report [as corrected on April 6, 2005] should not have been filed in the NPDB or that it is not accurate.  Your request that the report be voided from the NPDB is hereby denied.  The report will remain in the NPDB.
>
> In making this finding, the Secretary is explicitly <u>not</u> making any finding concerning the merits of allegations against you which served as the basis for GMH's action or the adequacy of the due process provided to you by the GMH.
>
> According to the record, GMH reported your "voluntary surrender of clinical privilege(s), while under, or to avoid, investigation relating to professional competence or conduct (1635)."  Specifically, the record reflects that:

21

- Your competence and professionalism were under review at the Gothenburg Memorial Hospital at the time you withdrew your medical staff application for reappointment and surrendered your privileges.
- The Medical Staff had concerns regarding recent obstetrical cases in which you were the primary physician, as well as concerns regarding your professionalism to nursing and administrative staff.
- You surrendered your privileges one and one half hours after the Medical Staff unanimously voted to reject your application for reappointment and prior to that recommendation being forwarded to the Board of Directors for further action.

You dispute the report claiming that:

1. The adverse report was filed after a recall election of the members of the hospital board which you initiated.
2. You voluntarily surrendered your privileges because of issues completely unrelated to your professional competency and conduct.
3. In order for a surrender of privileges to be reportable, an investigation must be carried out by the reporting health care entity. An investigation must be shown by contemporaneous evidence. There is no such evidence present here, because there was no investigation.
4. [Name Deleted] has continually tried to add or change the allegations and has now abandoned his earlier claims. This calls into question his credibility.
5. There was no investigation being conducted by the health care entity, nor was one going to be performed.
6. Nothing in any records or minutes of staff meetings indicates that your competence or conduct was the subject of a formal investigation or professional review action.
7. You have two written statements from the hospital medical chief of staff, dated prior to and after the adverse action report, stating there are no concerns about you professional conduct and there is not negative information in your hospital personnel file.

22

8. Despite repeated attempts to create an investigation where none existed [Name Deleted] has failed to provide evidence the health care entity has initiated an investigation contemporaneous to your surrender of privileges, or that you surrendered privileges to avoid an investigation. He lacks such evidence because there is no evidence.

9. [Name Deleted] cannot now create an investigation where there was none.

10. [Name Deleted] has continued to backpedal in an attempt to turn his allegations into a reportable event and thereby turn a personal vendetta into a professional matter.

Your claims #1, 2, 4 and 10 are all beyond the scope of Secretarial Review. Under the dispute resolution process the Secretary can review only (1) whether the action is reportable under applicable law and regulations and (2) whether the report accurately describes the action. The record reflects that you voluntarily surrendered your clinical privilege(s), while under investigation. This is a reportable event.

Your claims #3, 5, 6, 7, 8 and 9 all challenge the existence of an investigation at the time you surrendered your clinical privileges. John Johnson, CEO of GMH sent to our office a letter of March 4, 2005 with enclosures supporting GMH's claim that an investigation was in process. We forwarded a copy of the letter and enclosures to you and your counsel. Specifically, there is a note with a facsimile date of "Apr 09 04 08:49am" detailing pending deliberations of the Executive Committee. The note reads in pertinent part: "Dr. Costa, the general nature of the evidence supporting this review request are as follows:" and proceeds [sic] to out line [sic] obstetrical deliveries on April 1, April 2 and December in which you allegedly encountered difficulty. Additionally, there are Medical Staff minutes of July 2, 2004 where your practice activity was discussed. Specifically, the minutes state:

> Alleged concerns include but are not limited to the following:
> > Dr. Costa failing to supervise his PA
> > PA refusing to take ER call but wanting to remain on active medical staff.

23

Dr. Costa requesting a status for PA that did not exist in the medical staff bylaws.

Dr. Costa failing to intervene or attempt to correct situations in which his PA was argumentative and verbally abusive to hospital staff members.

Dr. Costa allowing his PA to engage in activities outside her scope of practice.

    a.    Stripping membranes in office setting

    b.    Giving TNKase in ER with no supervising physician in attendance

    c.    Allowing PA to deliver babies, perform third and fourth degree perineal tears and lacerations and pull umbilical cord apart.

Dr. Costa accused the hospital and staff of a shameful decline in the quality of care being provided.

Dr. Costa in a letter to the editor, referred to the Administrator as a "tin horn"

In a sworn statement, indicated that the Board of Directors was inadequate in their fiduciary responsibility.

In a sworn statement, indicated that the Board of Directors had "utterly failed" in their responsibility to oversee the administrator of the facility.

Accused the hospital of overcharging for copies of documents (unfounded).

Accused the hospital Board of having secret, illegal meetings (unfounded).

Alleged violation of the HIPPA privacy issue and signed (OHCA) Organized Health Care Arrangement.

Moreover, Mr. Johnson states in his above-referenced March 4, 2005 letter that:

"... I decided that those meeting minutes were relevant to your determination in that they set forth the ***culmination of the investigation*** which resulted in the medical staff voting to reject Dr. Costa's application for renewal of staff privileges." [our emphasis]

24

Investigations are discussed in the NPDB Guidebook . . . at page E-19, as follows:

> "A health care entity that submits an AAR based on surrender or restriction of a physician's or dentist's privileges while under investigation should have contemporaneous evidence of an ongoing investigation at the time of surrender, or evidence of a plea bargain.  The reporting entity should be able to produce evidence that an investigation was initiated prior to the surrender of clinical privileges by a practitioner.  Examples of acceptable evidence may include minutes or excerpts from committee meetings, orders from hospital officials directing an investigation, and notices to practitioners of an investigation."

Although some of the allegations at issue do not concern your professional conduct or professional competence, the July 2, 2004 minutes clearly are evidence of an investigation of your clinical practice activity in keeping with the Guidebook requirements cited above.  The minutes indicate that you and areas of your clinical practice activity were under investigation by the GMH Medical Staff for professional conduct or professional competence issues at the time you tendered your surrender of privileges. Your claims that there was no investigation are without merit.

(AR 193-96 (emphasis in original).)

## II.  DISCUSSION

"[I]f a practitioner applies for renewal of medical staff appointment or clinical privileges and voluntarily withdraws that application while under investigation by the health care entity for possible professional incompetence or improper professional conduct, or in return for not conducting such an investigation or taking a professional review action, then the withdrawal of application for clinical privileges is reportable to the NPDB."  NPDB Guidebook, at E-19 (emphasis omitted).   In this case, there is no claim made by the hospital, nor any finding made by the Secretary, that

25

Dr. Costa withdrew his application "in return for" the hospital not conducting an investigation or a professional review action. In other words, the record does not contain "evidence of a plea bargain." <u>See</u> NPDB Guidebook, at E-19 (quoted in the Secretary's decision). The only issue presented in this case is whether Dr. Costa withdrew his application "while under investigation by the [hospital] for possible professional incompetence or improper professional conduct." <u>See</u> <u>id.</u>

The term "investigation," as used in the HCQIA, is not defined by statute or by regulation. However, the Secretary has established the following "guidelines for investigations" within the scope of the Act:

- An investigation must be carried out by the health care entity, not an individual on the staff.

- The investigation must be focused on the practitioner in question.

- The investigation must concern the professional competence and/or professional conduct of the practitioner in question.

- A routine or general review of cases is not an investigation.

- An investigation should be the precursor to a professional review action.

- An investigation is considered ongoing until the health care entity's decision making authority takes a final action or formally closes the investigation.

NPDB Guidebook, at E-19.

The term "professional review action" (as used in the next-to-last guideline listed above, and also in 42 U.S.C. § 11133) is defined in the HCQIA:

The term "professional review action" means an action or recommendation of a professional review body which is taken or made

26

in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges, or membership in a professional society, of the physician.  Such term includes a formal decision of a professional review body not to take an action or make a recommendation described in the previous sentence and also includes professional review activities relating to a professional review action.

42 U.S.C. § 11151(9) (in part).

The term "professional review body" means a health care entity and the governing body or any committee of a health care entity which conducts professional review activity, and includes any committee of the medical staff of such an entity when assisting the governing body in a professional review activity.

42 U.S.C. § 11151(11).

The term "professional review activity" means an activity of a health care entity with respect to an individual physician—
    (A) to determine whether the physician may have clinical privileges with respect to, or membership in, the entity,
    (B) to determine the scope or conditions of such privileges or membership, or
    (C) to change or modify such privileges or membership.

42 U.S.C. § 11151(10).

The term "clinical privileges" includes privileges, membership on the medical staff, and the other circumstances pertaining to the furnishing of medical care under which a physician or other licensed health care practitioner is permitted to furnish such care by a health care entity.

42 U.S.C. § 11151(3).

The term "adversely affecting" includes reducing, restricting, suspending, revoking, denying, or failing to renew clinical privileges or membership in a health care entity.

42 U.S.C. § 11151(1).

The medical staff meeting that was convened on July 2, 2004, to consider Dr. Costa's application for renewal of staff privileges, was a "professional review activity," and the vote taken at that meeting, to reject the application, could qualify as a "professional review action."  There is no evidence, however, that the quality assurance meeting conducted on April 9, 2004, was a "precursor" to such action.[12] The issues discussed at the two meetings were completely different.  The April 9th meeting was called to review Dr. Costa's handling of a delivery on April 1, 2004, and the scope of the meeting appears to have been expanded by Mr. Johnson to include a discussion of two other deliveries, on April 2, 2004, and in December 2003.  None of these obstetrical cases received any mention in the minutes of the July 2nd staff meeting.  In fact, the only "competence" issue discussed at the July 2nd meeting was Dr. Costa's alleged failure to supervise his physician's assistant, particularly in allowing the PA to engage in activities outside her scope of practice.[13]

The record also fails to establish that the April 9th meeting was treated as an investigation by anyone other than Mr. Johnson.  ("An investigation must be carried out by the health care entity, not an individual on the staff."  NPDB Guidebook, at E-19.)  If this meeting was part of an executive committee investigation conducted under Article VI of the medical staff By-Laws, then available documentation should

---

[12] A "precursor" is "one that precedes and indicates the approach of another." Webster's Third New International Dictionary, p. 1785 (1986).

[13] The meeting minutes do not reflect when the PA allegedly exceeded the scope of her practice, but her activities at the hospital had ceased one year earlier, on July 1, 2003.

include "a written request for an investigation of the matter . . . making specific reference to the activity or conduct which gave rise to the request," and the executive committee's "summary of such interview" with Dr. Costa.  (AR 139-40.)  Neither document has been produced.[14]  Nor is there evidence that the executive committee ever made any recommendation to the hospital's governing board as to whether the obstetrical cases that were reviewed at the April 9th meeting involved misconduct on anyone's part that warranted disciplinary action.  For all that appears, the concerns voiced by Mr. Johnson were laid to rest at that meeting.

The correction adverse action report, filed on April 6, 2005, indicates that Dr. Costa's application was rejected because the medical staff (1) had "concerns regarding recent obstetrical cases in which Dr. Costa was the primary physician," and (2) had "concerns regarding his professionalism to nursing and administrative staff." (AR 88.)  The first claimed reason for the medical staff's action is not substantiated by the July 2nd meeting minutes, and thus should not have been allowed to remain in the report.  An example given in the guidelines involves a case where a practitioner disputed a report that he had resigned while under investigation for professional competence, claiming that he was unaware of the alleged investigation and had resigned for personal reasons.  As in the present case, the Secretary requested the hospital to provide contemporaneous documentation of the investigation, which "might have included findings of reviewers or directives of the executive committee or other professional review bodies in the hospital, or minutes from a professional review entity."  NPDB Guidebook, at F-8.  The hospital was unable or unwilling to provide the requested documentation.  While stating that the practitioner did not need to know about the investigation when he resigned, and also stating that the reason given by the practitioner for his resignation was irrelevant to the issue of its reportability, the Secretary ruled that the report should be voided "[s]ince no

_____

[14] Mr. Johnson told the Secretary that "[d]ue to the confidentiality of Quality Assurance meetings, I am not providing a copy of the minutes of this [April 9, 2004] meeting."  (AR 60.)

contemporaneous documentation of an ongoing investigation was provided[.]"  Id.
That is precisely the situation presented in this case with respect to the hospital's
alleged investigation into Dr. Costa's professional competence involving the "recent
obstetrical cases."

The second claimed reason for the medical staff's vote (i.e., concerns about
Dr. Costa's "professionalism" in dealing with nursing and administrative staff) is only
partially supported by the July 2nd meeting minutes.  That is, the minutes do not
mention anything about unprofessional conduct toward nurses; it merely appears
that Dr. Costa had displayed disdain for the hospital's CEO and governing board.

A "professional review action that adversely affects the clinical privileges of
a physician for a period longer than 30 days" is reportable to the NPDB.  See 42
U.S.C. § 11133(a)(1)(A).  To be reportable, however, a denial of privileges must
involve conduct which "affects or could affect adversely the health or welfare of a
patient or patients."  42 U.S.C. § 11151(9).  Because of this limitation, a medical staff
recommendation that Dr. Costa's privileges not be renewed because of his bad
relationship with the hospital administration would not constitute a "professional
review action," and a later decision by the hospital's governing board to adopt the
recommendation would not be reportable.[15]  Even if such a recommendation were
treated as the beginning of an investigation, it would not relate to "possible . . .
improper professional conduct," and would not cause a subsequent surrender of
clinical privileges to be reportable under 42 U.S.C. § 11133(a)(1)(B)(i).  For example,
the guidelines describe a case where a hospital reported that a practitioner had
resigned while under investigation for "problems in the practitioner's bedside
manner," and "[t]he Secretary found that the report should be voided because the
reason for the investigation as shown in the narrative was unrelated to professional
competence or conduct."  NPDB Guidebook, at F-8.

---

[15] Generally, an adverse action on clinical privileges "is not reportable until it
is made final by the health care entity."  NPDB Guidebook at E-33.

In the present case, the Secretary acknowledged that "some of the allegations at issue [at the July 2nd meeting] do not concern [Dr. Costa's] professional conduct or professional competence," (AR 196), but, unfortunately, those allegations were not identified by the Secretary.  Nonetheless, it is apparent that the only "concerns" discussed at the July 2nd meeting that could possibly have an adverse effect on the health and welfare of patients were some of the failure-to-supervise issues involving Dr. Costa's physician's assistant.  That is, Dr. Costa clearly was not engaging in "improper professional conduct" under the HCQIA when he charged certain board members with failing to discharge their fiduciary duties and to oversee Mr. Johnson, leading to a "shameful decline in the quality of care provided" at the hospital, when he publicly called Mr. Johnson  a "tinhorn hospital administrator," when he accused the hospital of overcharging for copies, when he accused the board of conducting illegal, secret meetings, or when he allegedly violated HIPAA privacy rules.[16]  The claim that medical staff voted to reject Dr. Costa's application because of "concerns regarding his professionalism to nursing and administrative staff" should also have been ordered removed from the adverse action report.

The "failure-to-supervise" issues were not described in the adverse action report, but were identified in the July 2nd minutes as reasons for the medical staff's rejection of Dr. Costa's application.  However, the fact that the minutes show that the medical staff's vote was based, in part, upon conduct directly related to the health and welfare of patients, does not save the report.  It is not sufficient simply to state that "Dr. Costa's competence and professionalism were under review . . . at the time he withdrew his medical staff application for re-appointment and surrendered his privileges[,] . . . one and one half hours after the medical staff  unanimously voted to reject his application . . .."  (AR 88.)  As discussed in the guidelines:

---

[16] No information regarding the alleged HIPAA violation is contained in the record, but the adverse action report does not claim that such violation was a factor in the medical staff's rejection of Dr. Costa's application.

> The purpose of the narrative description section of the report is to describe the acts, omissions, or reasons for the action reported. Section 423(a)(3)(B) of the *Health Care Quality Assurance Act* [42 U.S.C., Section 11133(a)(3)(B)] requires such "description of the acts or omissions or other reasons for the action." The legislative history states that the narrative ". . . does not necessarily require an extensive description of the acts or omissions or other reasons for the action or, if known, for the surrender. It does, however, require sufficient specificity to enable a knowledgeable observer to determine clearly the circumstances of the action or surrender."

NPDB Guidebook, at F-7. Furthermore, the adverse action report in this case does not even include the "basis for action" code assigned to "improper or inadequate supervision or delegation," G1. See "Basis for Action Codes - Individual Subjects" at http://www.npdb-hipdb.hrsa.gov/codes.html. It only lists code 10, "unprofessional conduct," and code AD, "surrendered clinical privileges." (AR 88.) "[A]ll reasons for the action should be explained in the narrative [and] . . . [t]he reporting entity may select up to four Basis for Action codes to indicate these multiple reasons." NPDB Guidebook, at E-18.

In summary, with respect to the report that was actually made by the hospital, there is no rational basis for the Secretary's conclusion that "the July 2, 2004 minutes clearly are evidence of an investigation of your clinical practice activity in keeping with the Guidebook requirements [that the reporting entity have contemporaneous documentation] . . .." (AR 196.) The Secretary therefore erred as a matter of law in ruling that the report was accurate as submitted. Once the inaccurate statements are removed, the report fails to establish that Dr. Costa's surrender of clinical privileges occurred under reportable circumstances.

## III. CONCLUSION

Summary judgment will be granted in favor of the plaintiff, and, pursuant to the Administrative Procedure Act, 5 U.S.C. § 706 (2)(A), judgment will be entered

4:05-cv-03248-RGK-DLP   Doc # 40   Filed: 07/26/06   Page 33 of 33 - Page ID # 443

setting aside the Secretary's decision of August 24, 2005, and directing that the adverse action report filed on April 6, 2005, by Gothenburg Memorial Hospital be removed from the National Practitioner Data Bank.  I make no determination as to whether another report could or should be filed by the hospital.

Accordingly,

IT IS ORDERED that:

1.      Plaintiff's motion for summary judgment (filing 26) is granted.

2.      Defendants' motion for summary judgment (filing 28) is denied.

3.      Judgment will be entered by separate document, generally providing that Secretary's decision of August 24, 2005, is set aside and that the Secretary shall remove from the National Practitioner Data Bank the adverse action report filed on April 6, 2005, by Gothenburg Memorial Hospital.

July 26, 2006.                          BY THE COURT:

                                        s/ *Richard G. Kopf*
                                        United States District Judge